UNITED STATES of America

v.

Steven Miles OEHLENSCHLAGER, Jr.

No. 4–94–CR–96(01).

United States District Court,
D. Minnesota,
Fourth Division.

Aug. 16, 1995.

Katherian D. Roe, U.S. Public Defenders Office, Minneapolis, MN, for defendant.

Jeffrey S. Paulsen, U.S. Attorney's Office, Minneapolis, MN, for U.S.

OPINION: SENTENCING MEM-
ORANDUM AND STATE-
MENT OF REASONS

ROSENBAUM, District Judge.

I. *Findings of Fact*

The defendant pleaded guilty to illegally importing wildlife and aiding and abetting the illegal importation of wildlife in foreign commerce, in violation of 16 U.S.C. §§ 3372(a)(2)(A) and 3373(d)(1)(A). The Sentencing Reform Act of 1984 applies, particularly the 1994 version of the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.").

The probation office has conducted its investigation and prepared a presentence investigation report ("PSI"), pursuant to Rule 32 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 3552. Except as noted herein, there are no unresolved objections to the factual statements contained in the PSI; accordingly, the Court adopts as its findings of fact the PSI's undisputed factual statements.

## II. *Application of Guidelines to Facts*

The Court makes the following determinations in accordance with the Guidelines:

### A. *Acceptance of Responsibility*

The Court finds that the defendant is entitled to a two-point reduction for acceptance of responsibility, as he has demonstrated a recognition and affirmative acceptance of personal responsibility for his conduct as contemplated by the Guidelines. *See* U.S.S.G. § 3E1.1(a).

### B. *Role in the Offense*

■ The defendant objects to a two-point enhancement for his role in the offense and a five-point enhancement for the market value of the illegally-taken wildlife, as recommended in ¶¶ 34, 43, and 45 of the PSI. The government responds that because the defendant was an organizer in the offense, a two-point enhancement is warranted. The government also asserts that, according to the U.S. Department of the Interior, the valuations of the wildlife set forth in ¶ 34 of the PSI are accurate.

The Court determines that the defendant owned the business which illegally imported wildlife; enlisted his father's assistance in the illegal enterprise; arranged numerous trips to Canada to facilitate his unlawful conduct; and received profits from these illegal acts. Under these circumstances, the Court finds that a two-point enhancement is warranted for the defendant's role in the offense, pursuant to § 3B1.1(c) of the Guidelines.

### C. *Valuation of the Stolen and Smuggled Wildlife*

■ Section 2Q2.1(b)(3)(A) of the Guidelines provides that: "If the market value of the wildlife exceeds $2000, increase the offense level by the corresponding number of levels from the table at 2F1.1, Fraud and Deceit." Application Note 4 of that section applies here and provides that:

> When information is reasonably available, "market value" ... shall be based on the fair-market retail price. Where the fair-market retail price is difficult to ascertain, the court may make a reasonable estimate using any reliable information, such as the reasonable replacement or restitution cost or the acquisition and preservation ... cost.

The government and the defendant agree that, for purposes of establishing relevant conduct, the wildlife consists of 36 White-Winged Scoter eggs, 100 American Goldeneye eggs, 13 Red-breasted Merganser eggs, 50 Common Merganser eggs, and 1 Sandhill Crane. The crane has an admitted value of $650. The Court must now determine the "market value" of the eggs under the Guidelines.

The United States argues that the value of the eggs is established by reference to the value of adult birds of the respective species. The United States refers to the defendant's own price list, which values the respective adult ducks at over $50,000. This valuation would enhance the offense level by five points, pursuant to Section 2F1.1(B)(1)(F) of the Guidelines.

The defendant argues that determining the value of an egg based on the value of an adult bird is unfair and unrealistic, because the eggs have a high mortality rate, and in the wild, nests are sometimes deserted ("dump nests") and the eggs never mature. The defendant also asserts that even viable eggs may develop into unsalable hatchlings. It is the defendant's position that these hazards decrease the value of the eggs to a minimal or nominal sum.

The Court finds defendant's formulation to be disingenuous in the extreme. The argument is unpleasantly like that of the child who kills her parents and seeks mercy because she is an orphan.

These eggs were laid in the wild. The Court cannot, and does not, doubt that they would have been subject to predation, flood, cold, hail, or bad parenting. All of these risks, and doubtless others, could have befallen these protected birds. Had they succumbed to these or any other risks, neither this Court nor the defendant would have known. But a natural risk did not befall these unfortunate creatures. These eggs, and the wildlife they represented, were beset by another, greater, hazard—one which the laws of two countries have tried, unsuccessfully, to abate. This depredation was at the hands of a late twentieth century poacher. The Court's difficulty in establishing a market value is a direct result of the defendant's own actions. It is he who interrupted the natural maturation process and wrongly interfered with these protected species. Words of care for the fate of endangered bird eggs are hollow when uttered by him.

The Court has reviewed the evidence in this case and the government's videotape of the defendant's extensive preparations. The videotape displayed a wildlife pen, several hundred feet to a side. Within the pen was a man-made duck pond on which many of the captive birds were swimming. There was a heated brood house in which to hatch the wild bird eggs. The defendant's preparations and facilities were extensive.

The Court has considered the defendant's multiple border crossings to disguise his illegal acts. The defendant contrived to avoid suspicion by crossing the United States/Canadian border at multiple checkpoints relatively close to each other, each time bringing three or four dozen eggs into this country. Understandably, he was concerned that a careful border guard might question why anyone would cross the border with ten or twelve dozen eggs. These eggs, secreted in ordinary commercial egg cartons, were the items for which he has been prosecuted.

The Court has reviewed documents written in the defendant's own hand, including price lists from which the United States prepared its valuation estimates. The price lists offered to sell or trade these unfortunate creatures. Also among the defendant's documents was a letter which offered a "bonus"

duck if the recipient supplied counterfeit documents allowing the defendant to continue, and to increase, his illegal enterprise.

Under these circumstances, the Court determines that the defendant may not discount the value of the stolen eggs which he smuggled into this country by suggesting that they are subject to natural defects or normal mortality. It is the defendant who subjected these eggs to danger and has made it impossible to determine whether these eggs came from dump nests. It ill-befits him to suggest that, based upon his own acts, valuation is difficult to ascertain. Eggs fail in the wild; some will not grow to productive adulthood no matter where or how they are raised. These facts, however, do not make an evaluation of these eggs impossible for sentencing purposes.

The Court finds it reasonable to rely on the defendant's estimate of the value of adult birds to approximate the market value of these eggs. This is the sum by which the defendant stood to profit in the event his criminal enterprise succeeded. It would be unreasonable to diminish his penalty as a result of his purposeful endangerment of already vulnerable waterfowl.

The government and the defendant have established the value of these ducks to be over $54,000, and the Court accepts this value for sentencing purposes. Even applying a twenty percent reduction in this value, and the Court declines to do so, the value of these eggs (and their potential to produce salable birds) is in excess of $40,000. This value would require the enhancement dictated by § 2F1.1(b)(1)(F) of the Guidelines. Therefore, the defendant's base offense level will be increased by five points for the value of the wildlife.

### D. *Total Offense Level*

Pursuant to U.S.S.G. § 2Q2.1(b)(3)(A), the base offense level is six. This number is enhanced by two points, pursuant to §§ 2Q2.1(b)(1)(A) and (b)(1)(B), because the offense was committed for pecuniary gain and involved a pattern of similar violations. Two additional points are added for the defendant's role in the offense under

248

§ 3B1.1(c). Finally, the Court adds five points, pursuant to § 2F1.1(b)(1)(F), for the market value of the wildlife. These enhancements raise the total offense level to fifteen.

A two-point reduction is granted for acceptance of responsibility under § 3E1.1. Therefore, the Court determines the total offense level under the Guidelines to be thirteen.

### E.  Criminal History Category

Defendant has no criminal history points. Therefore, his criminal history category is I.

### F.  Guideline Sentencing Range

Based upon a total offense level of thirteen and a criminal history category of I, the presumptive Guidelines range is twelve to eighteen months. See U.S.S.G. Sentencing Table.

### G.  Supervised Release

The Court may impose a term of supervised release of two to three years. U.S.S.G. § 5D1.2(b).

### H.  Fine

The presumptive fine range is $3,000 to $250,000. U.S.S.G. § 5E1.2(c). If the defendant is able to pay, the Court may direct that he pay an additional amount equal to the costs of imprisonment, probation, or supervised release. U.S.S.G. § 5E1.2(i).

### I.  Special Assessment

A mandatory special assessment in the amount of $100 must be paid to the Crime Victims Fund. U.S.S.G. § 5E1.3.

### III.  Imposition of Sentence

Defendant, Steven Miles Oehlenschlager, Jr., has been charged in Counts I and VI of an indictment with illegally importing wildlife and aiding and abetting the illegal importation of wildlife in foreign commerce, both in violation of 16 U.S.C. §§ 3372(a)(2)(A) and 3373(d)(1)(A). Based upon his plea of guilty, it is considered and adjudged that the defendant is guilty of those offenses.

Therefore, it is adjudged that the defendant is committed to the custody of the Bureau of Prisons for a term of fifteen months on each of Counts I and VI, said terms to be served concurrently. The defendant shall be placed in community confinement with work release privileges.

The Court recommends a federal correctional institution or a jail-type facility in the State of Minnesota for service of sentence.

Further, it is ordered that the defendant serve a supervised release term of three years on each of Counts I and VI, to be served concurrently, under the following conditions:

1.  Defendant shall comply with all federal, state, and local laws, 18 U.S.C. § 3583(d);

2.  Defendant shall comply with all rules and regulations of the probation office;

3.  Defendant shall not possess firearms or other dangerous weapons, U.S.S.G. § 5B1.4(b)(14); and

4.  Defendant shall comply with the standard conditions of supervised release recommended by the Sentencing Commission, U.S.S.G. § 5B1.4(a).

Further, it is ordered that defendant pay the special assessment fee of $100, which is due immediately.

Additionally, the defendant is ordered to pay a fine in the amount of $10,000 at the direction of the probation office, but at a rate of not less than $3,330 per year during his term of supervised release. The Court determines that the defendant does not have the ability to pay interest; accordingly, the interest requirement is waived.

### IV.  Surrender

The Court finds that the defendant is a candidate for voluntary surrender. Defendant shall voluntarily surrender to an institution designated by the Bureau of Prisons.

### V.  Dismissal

The remaining Counts in the Indictment are dismissed on motion of the government.

## VI. *Appeal*

Defendant has a right to appeal from this sentence within ten days. *See* Federal Rules of Appellate Procedure 4. Failure to file a notice of appeal within the ten day period constitutes a waiver of the right to appeal. The government may also appeal from this sentence. Defendant is entitled to the assistance of counsel in taking an appeal, and if the defendant cannot afford a lawyer, one will be appointed at no cost.

## VII. *Statement of Reasons*

The Court finds that the sentence imposed is sufficient to comply with the statutory objectives for sentencing set forth at 18 U.S.C. § 3553(a).